## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| J. GREG HORINEK, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 24-1171-KHV |
| | ) | |
| SPIRIT AEROSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

On June 27, 2024, in the District Court of Sedgwick County, Kansas, plaintiff J. Greg Horinek filed suit against his former employer, Spirit AeroSystems, Inc., alleging race discrimination in violation of 42 U.S.C. § 1981 and retaliation for reporting unlawful acts in violation of Kansas public policy. See Pretrial Order (Doc. #55) filed July 2, 2025. On September 23, 2024, defendant removed the case to federal court. This matter is before the Court on Defendant Spirit AeroSystems, Inc.'s Motion For Summary Judgment (Doc. #57) filed July 16, 2025 and Plaintiff J. Greg Horinek's Motion for Leave to File Surreply Regarding Defendant's Motion for Summary Judgment (Doc. #71) filed August 24, 2025. The Court overrules defendant's motion for the reasons stated below and overrules plaintiff's motion as moot.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute

requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251–52.

## **Factual Background**

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

Spirit Aerosystems designs and builds aircraft parts and components for commercial aircraft, produces parts for government and military programs and designs and fabricates complex tooling for aircraft manufacturing and assembly.  From July 16, 2006 to March 9, 2023, Spirit

employed Horinek, a white man, as a metals mechanic.  At the time Spirit terminated his employment, Horinek's first-level manager was Jasen Venn, and his second-level manager (PLM) was Sean Winterburg.

Horinek worked in a sheet metal shop ("the shop") that did not do standard production. Instead, it did emergent sheet metal work and assisted with production for special orders.  At the time of his termination, Horinek worked on the first shift.  Ivan Quintanar, also a metals mechanic, worked in the same shop on second shift and is Latino.  The shop workers performed sophisticated work that could take years to learn.  Quintanar learned a considerable amount in his first six months in the shop, but he had issues. During inspections, Spirit flagged some of his orders as nonconforming, which caused some of his work to be returned or scrapped.  The shop defined nonconforming work as work that did not meet standards and thus could not be used.  Quality assurance personnel inspected the mechanics' work to ensure that all work was conforming and completed correctly.  If an employee made mistakes or had other work performance issues, management would issue corrective action or discipline.  Mechanics are not permitted to throw away material that a coworker needs, but management instructed employees to discard undocumented remnant material when they came across it.

Each day, the shop had a "production run" or "compliance list" which identified the order of priority for the jobs, with the most pressing jobs at the top of the list.  Mechanics in the shop identified which orders they were working on by marking them off the compliance list.

Spirit has a Diversity Equity & Inclusion (DEI) program with goals of increasing minorities in leadership to 20 per cent by 2030, and it works to engage and develop its Latino workforce. Spirit tracks race data for all aspects of the employment cycle, including hiring, turnover and promotions.

-3-

Near the end of 2022, when Quintanar began working in the shop with Horinek, they each reported concerns about the other, and other workers in the shop also lodged complaints about Quintanar. During the week of January 16, 2023, Spirit mounted a security camera in the shop. This camera remained in the shop and recorded in January, February and March of 2023. On January 23, 2023, after Spirit received an anonymous report that Horinek was harassing Quintanar because of his race, Quintanar gave an interview expressing a variety of concerns about Horinek. Horinek denied making racial comments and raised his own concerns about Quintanar blowing dirt and damaging his personal property. Spirit did not substantiate that Horinek had engaged in harassment based on race.

By January 26, 2023, on at least one occasion, managers caught Quintanar hiding work orders to ensure that only he worked on a particular part, which generally caused eight hours of delay per hidden part. On February 7, 2023, Venn emailed an update to Horinek's second-level manager, Winterburg, that Quintanar had hidden orders multiple times, lied about it and destroyed other employees' property. In particular, Venn reported that in violation of Spirit policies, Quintanar ripped Horinek's poster off the wall. On February 7, 2023, Winterburg had separate in-person meetings with Horinek and Quintanar and clearly set forth the expectation that Horinek and Quintanar would behave appropriately at work, and that any future misconduct or damage to property could lead to discipline.

The next day, February 8, 2023, shop workers James Altis, Ron Achey, Matt Snyder, Scott Montgomery and Jon Groves went with Horinek to Winterburg's office to address their own issues with Quintanar, which included property damage and general hostile behavior. Spirit did not terminate or otherwise discipline Altis, Achey, Snyder, Montgomery or Groves after they raised

-4-

these concerns.  By February of 2023, managers did not permit Quintanar to access the remnant material crib because they had caught him taking material to use on the wrong job.

On February 10, 2023, Quintanar told Brian Funk, another Spirit employee, to say "hi" to the wives of Horinek and Altis, Jen and Amy.  Neal Email (Doc. #58-37) filed July 16, 2025 at 1. Funk asked who Jen and Amy were, and Quintanar explained that they are wives of Horinek and Altis which he knows because he researched "outside of Spirit."  Id.  Quintanar also said that he knew their addresses.

On February 12, 2023, Horinek emailed several management and Human Resources personnel at Spirit, describing Quintanar's threats to Jen and Amy.  Horinek's email also addressed other instances of misconduct by Quintanar, including property destruction and performing "illegal" work.  Winterburg Email (Doc. #65-8) filed August 7, 2025 at 3.  Later, Quintanar recounted to HR that he had previously told Kim Brown (Spirit HR) that he "doesn't worry about anyone when he leaves here," and those guys "need to worry about their families, worry about their wife's once they leave."  Quintanar Deposition Transcript (Doc #65-11) at 35:62–65.

Two days after Horinek's email, in an email dated February 14, 2023, Jason Hohl, VP of Human Resources, acknowledged Quintanar's statement about the wives and Quintanar's history of property destruction.  He recommended moving Quintanar to another area.[1]

In the shop, a "hot part" refers to a part that is a high priority and needs to be completed quickly.  When an order first comes to the shop, it starts as paperwork explaining what the mechanics need to do with the part.  As the order progresses through operations, the mechanics

---

[1]     In October of 2022, Spirit had already moved Quintanar from the first shift to the second shift due to his issues with coworkers.

outline, trim, form and modify raw material until it becomes the final product.  They may refer to the order as a "part" or "hot part" at various points in this process.

On February 27, 2023, Quintanar performed work on a hot part and confirmed that his portion of the job was completed.  The next day, the inspection revealed that the part was not usable, which meant that the shop needed new material so someone could redo the work. Quintanar's mistake resulted in the work being "scrapped," and caused a delay in the work.  During first shift on February 28, 2023, Snyder found a piece of new material from the shop's on-site material crib and placed the material and paperwork for the part on Quintanar's desk for him to rework it.  Snyder claimed that he placed the part inside an "apple box" on Quintanar's desk, an open-top box where work orders are placed on a desk or work bench.  As part of this process, instead of cancelling the order and issuing a new work order, Maverick Mosiman (fabrication quality team lead) "backed up" the paperwork associated with the part for Quintanar to start over. When Snyder placed the material and paperwork on Quintanar's work bench, he indicated that Quintanar needed to work on the part.  Later, Horinek found this material—which he thought was "excess material" on Quintanar's bench—and disposed of it in the scrap bin.  Spirit later determined that Quintanar needed the material which Horinek had discarded.  Quintanar proceeded work on the part with unknown other material.

Early in the morning the following day, March 1, 2023, the next shift performed the subsequent operation on the part, so Horinek's scrapping of the material did not cause Spirit to lose part time.

On March 1, 2023, the day after he threw away the excess material, Horinek lodged a complaint that his microwave display in the shop had been set to the date of his son's recent death. Security reviewed video footage, which showed that Quintanar had placed an item inside the

microwave and warmed it, but the video did not show if he had punched any specific numbers. Later that day, Horinek entered a managers' meeting uninvited and announced that if they did not do anything about Quintanar, he was going to take care of the issues himself. Managers at this meeting construed Horinek's comments as a threat against Quintanar, and one manager left the meeting to catch Quintanar before he came into the shop to make sure that Horinek did not do anything to him. After they successfully navigated this shift change, Venn reported Horinek's statements to Spirit HR.

On March 2, 2023, at 8:54 a.m., Horinek sent an email to various Spirit management and HR personnel stating that he would reach out to Occupational Safety and Health Administration, the Federal Aviation Administration and local law enforcement to handle the unlawful conduct at Spirit. The same day, Venn and another Spirit manager, Parker Daugherty, reviewed security camera footage to see if they could determine what had happened to the hot part which Snyder had placed on Quintanar's desk on February 28, 2023. The footage showed Horinek take a piece of metal from Quintanar's work bench and walk out of view of the security camera toward the area with a scrap bin, where the material was later found.

Spirit obtained statements from Venn and Daugherty (who reviewed the security footage), Horinek, Horinek's Team Lead Snyder and Horinek's coworkers Altis, Groves and Montgomery. At 9:31 a.m. on March 3, 2023, Horinek provided a written statement to security stating that he took some "excess material" from a scrapped order and placed it in the scrap bin. Horinek Statement (Doc. #58-18). Horinek explained that he scrapped the material because he felt it was unethical to allow Quintanar to continue to remake parts illegally, and that he did not know anything about a missing part—he only scrapped excess material that was not issued for that order. Id. Horinek was not a supervisor and did not have authority to throw away material which

Quintanar needed to make the hot part. Also, Spirit policy required shop workers to clean up at the end of each day, and to scrap remnant material found in the workshop without tracers.

On March 3, 2023, at 11:50 a.m., Horinek called the Sheriff of Sedgwick County, Kansas. Horinek reported the events concerning Quintanar, including the property damage and possible threats to his wife. Horinek later testified that he made the report when he realized that Spirit would not take action to address his concerns with Quintanar. On March 3, Altis and Funk also left the shop to make reports to the Sheriff's deputy about Quintanar. Spirit did not discipline or terminate Altis or Funk for leaving the shop or giving statements to the Sheriff's deputy. At 2:00 p.m. that day, managers told Horinek that he was suspended pending investigation of the part scrapping incident.

On March 3, 2023, at 5:50 p.m., Mandy Trainer (Fabrication Vice President) emailed several management and HR personnel. Trainer Email (Doc. #58-33). Trainer wrote that Horinek "called the Sedgwick County Sheriff's Office to report the threat to his family that Spirit security has already unsubstantiated." Id. Trainer mentioned the manager's meeting and the alleged hot part issue, and she wrote, "in speaking as a team . . . we agreed that [Horinek]'s behavior has become increasingly concerning coupled with his blatant scrapping of good material for a hot part. As such, we agreed to suspend pending investigation and will be moving forward to TRB [Termination Review Board]." Id. Within two hours of Horinek's call to the Sheriff on March 3, 2023, Spirit suspended him. In her email that day, Trainer wrote that employees were threatening to quit their jobs over the situation and that the shop steward (Snyder) was surprised that they had not already fired Horinek. Horinek alleges that parts of Trainer's email are false, because Snyder did not recall any employee threatening to quit that day or that he expected Horinek to be fired. Trainer brought the case for termination and supported it before the TRB, but she did not sit on

the TRB.

As part of the investigation over Horinek's termination, OSHA interviewed Winterburg. In the interview, Winterburg told the investigator that Trainer made the final decision to terminate Horinek's employment. <u>Winterburg OSHA interview</u> (Doc. #65-27).   In Spirit's corporate deposition under Fed. R. Civ. P. Rule 30(b)(6), when asked if Trainer made the decision to fire Horinek, Carolyn Crabb (Spirit HR manager) testified that "she's the one who brought it forward." Asked to explain her response, Crabb stated "we had the case and then we always ask, hey do you support this termination. And she said yes." <u>Crabb Corporate Deposition</u> (Doc. #65-1).   Crabb also agreed that Trainer "was the moving force behind the termination." <u>Id.</u>   At her deposition, Trainer denied that she was the decisionmaker.

The TRB agreed to terminate Horinek's employment on March 9, 2023 for intentionally taking a hot part from the apple box designated for Quintanar and placing it in the scrap bin, which resulted in "a work stoppage and unnecessary cost to the company."[2] <u>Disciplinary Action Form</u> (Doc. #58-20).   Spirit claimed that the action violated Disciplinary Guidelines PRO-3885, which includes intolerable behavior and/or gross misconduct which has a serious adverse effect on business operations, the well-being and/or work environment of employees or others or the company's physical or intellectual property. <u>Id.</u>

After Spirit terminated Horinek's employment, Altis, who is white, made complaints about various acts that he attributed to Quintanar which allegedly created a hostile work environment. After these complaints, Spirit did not discipline Altis or terminate his employment.

On June 14, 2023, Venn submitted a manager request for discipline on Quintanar because

---

[2]        The record does not reflect who was on the TRB or how they were selected.

he "continues to harass other people in the shop on the off shift by messing with their property, and sending e-mails and making false allegations, this continues to create hostile work environment." Manager Request for Discipline (Doc. # 65-33) at 2. Venn noted, "this has been going on for months, talking and trying to coach him doesn't work." Id. Spirit substantiated Venn's complaint, but still employs Quintanar.

On June 15, 2023, Venn told an OSHA investigator that he had cancelled the order that Quintanar needed to rework on February 28, 2023. Venn OSHA Interview (Doc. #65-22). In his deposition, however, Venn admitted that this statement was not true; he only backed up the order and made Quintanar re-do it. He also told the OSHA investigator that Spirit lost 48 hours of time on the order. At arbitration, Venn testified that Spirit only lost most of second shift.[3]

On June 27, 2024, plaintiff filed suit against defendant. Petition (Doc. #1-1). Plaintiff asserts that Spirit terminated his employment (1) on the basis of race and (2) because he made good faith reports of criminal threats, criminal damage to property and stalking to Spirit and law enforcement. Pretrial Order (Doc. #55) at 14. On July 16, 2025, defendant filed a motion for summary judgment. Defendant Spirit AeroSystems, Inc.'s Motion For Summary Judgment (Doc. #57).

## Analysis

Plaintiff alleges that in violation of 42 U.S.C. § 1981 and Kansas Public Policy, defendant terminated his employment due to race and in retaliation for reporting unlawful acts. Pretrial Order

---

[3]    Plaintiff cites this discrepancy as proof that Venn lied and that none of his testimony is credible. Rule 56(c)(1)(A), Fed. R. Civ. P. states that "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of material in the record." Plaintiff has not offered any specific grounds for controverting the factual assertions, cited the record or offered contrary evidence. Thus, for the purposes of summary judgment, the Court deems these factual assertions uncontroverted.

(Doc. #55).   Defendant seeks summary judgment, arguing that Spirit had a legitimate, non-discriminatory reason to terminate Horinek's employment, and therefore plaintiff cannot establish a prima facie case or pretext. See Defendant Spirit AeroSystems Memorandum In Support Of Its Motion For Summary Judgment (Doc. #58).

## I.      Race Discrimination

Plaintiff asserts that in violation of 42 U.S.C. § 1981, defendant terminated his employment based on race.  Defendant seeks summary judgment, arguing that plaintiff cannot establish a prima facie case of race discrimination or show that defendant's legitimate, non-discriminatory reason for terminating his employment was pretext for illegal discrimination.

Plaintiff relies on indirect evidence of discrimination, which requires application of the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792(1973).  See English v. Colo. Dep't of Corr., 248 F.3d 1002, 1007 (10th Cir. 2001) (McDonnell Douglas burden-shifting framework applies to § 1981 claims).  Under this framework, plaintiff bears the initial burden of establishing a prima facie case, i.e. that (1) he belongs to a protected class; (2) he suffered adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.  See McDonnell Douglas, 411 U.S. at 802; Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002).  The burden then shifts to defendant to provide a legitimate, nondiscriminatory reason for the action.  McDonnell Douglas, 411 U.S. at 802.  If defendant successfully does so, the burden shifts back to plaintiff to show that defendant's stated reason is pretext for discriminatory intent. Id. at 804.  Defendant concedes that the termination of plaintiff's employment constitutes an

adverse action, and that plaintiff belongs to a protected class.[4] Defendant denies, however, that the action occurred under circumstances which give rise to an inference of discrimination.

A.    Whether Plaintiff Can Establish Circumstances Which Give Rise To An Inference Of Discrimination

A variety of circumstances can give rise to an inference of discrimination, including decisionmaker actions or remarks that may reflect a discriminatory animus, or giving preferential treatment to employees outside the protected class. See Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005).  Plaintiff cites evidence that (1) defendant has DEI programs which favor Hispanic workers over white workers and (2) defendant treated Quintanar more favorably than plaintiff. Plaintiff was a 17-year white male employee.  Viewing the evidence in the light most favorable to him, he accidentally discarded a piece of material on February 28, 2023—a mistake which had no adverse impact on Spirit.  On this record, given Spirit's extended indulgence in misconduct by Quintanar, plaintiff has shown a genuine issue of material fact whether defendant terminated his employment under circumstances which give rise to an inference of discrimination.

B.    Whether Plaintiff Can Establish Pretext

Because plaintiff has set forth a prima facie case of discrimination, the burden shifts to defendant to proffer a legitimate, non-discriminatory reason for its decision.  Defendant claims that it terminated plaintiff's employment because he violated company policy by intentionally taking material from Quintanar's work bench and placing it in the scrap bin.

---

[4]    The Tenth Circuit previously held that a plaintiff who belonged to a majority group and brought a "reverse discrimination" claim must also "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."  Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir. 1992).  In Ames v. Ohio Dep't of Youth Servs., 605 U.S. 303 (2025), the United States Supreme Court abrogated this standard and held that proving disparate treatment under Title VII does not vary based on whether the plaintiff is a member of a majority group.

Because defendant has offered a non-discriminatory reason, plaintiff must establish that the legitimate reason offered by defendant was not the true reason but rather was pretext. See Trujillo v. PacifiCorp, 524 F.3d 1149, 1154–55 (10th Cir. 2008). To defeat summary judgment, plaintiff's burden is to demonstrate a genuine issue of material fact whether the proffered reason is unworthy of belief. Id. at 1158.

At this final step of the McDonnell Douglas framework, the presumption of discrimination created by plaintiff's prima facie case "simply drops out of the picture." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)). At this stage, plaintiff carries the full burden of persuasion to show that defendant discriminated against him on the illegal basis of race. Id. (citing Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005)). Plaintiff may show "pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Id. (quotation omitted).

Plaintiff argues that defendant's proffered reasons for terminating his employment are pretextual because (1) the decisionmaker has not been truthful, (2) defendant has offered inconsistent explanations for the termination and (3) defendant treated him differently from a comparable employee.

As evidence that defendant lied, plaintiff has presented evidence that Venn told OSHA that he cancelled the order which Quintanar needed to rework on February 28, 2023, while in reality he only "backed up" the order. These statements do not concern material facts and are not evidence of pretext.

As evidence of pretext, plaintiff also cites inconsistent statements.  Plaintiff argues that Trainer was the decisionmaker.  She denied this, and the TRB made the final decision.  Inconsistent statements by different managers concerning responsibility for the termination decision is evidence of pretext.  Paup v. Gear Prods., Inc., 327 F. App'x 100, 112 (10th Cir. 2009).  Defendant argues that Trainer recommended the termination, but that the TRB made the final decision.   If a review board was the final decisionmaker, its motive is typically in the focus of the pretext analysis.  Macon v. United Parcel Serv., Inc., 743 F.3d 708, 715 (10th Cir. 2014).  If the review board was a "rubber stamp" and relied on biased reports or conclusions of others, the focus shifts back to those who made the recommendation.  Id.  Here, plaintiff presented evidence that Trainer (1) recommended and was the driving force behind his termination and (2) included false facts in her email recommending termination on March 3, 2023 i.e. that other spirit employees were threatening to quit.  A rational jury could view this evidence as proof of bias, and Spirit's corporate testimony that Trainer was the driving force behind the termination is sufficient to create a genuine issue of material facts as to pretext.

Plaintiff also argues that defendant has offered inconsistent explanations for his termination by changing its stated reason from causing a work stoppage to intentionally scrapping good material.  Defendant denies that its stated reason was ever a work stoppage and argues that it terminated Horinek's employment for "intentional conduct, not the consequences of that conduct."  Defendant's Memorandum in Support of Summary Judgment (Doc. #58) at 19.  Plaintiff responds that defendant shifted its explanation once discovery revealed that no work stoppage had occurred.  Defendant's Disciplinary Action Form (Doc. #58-20) expressly cites a work stoppage "and unnecessary cost to the company" in its reason for termination.  A rational jury could view this stated reason as false, i.e. evidence of pretext.

Plaintiff can also establish pretext by demonstrating that defendant treated him differently from comparable employees. Swackhammer, 493 F.3d at 1167–1168. For a valid comparison, the other employees must be similarly situated to plaintiff in all material respects and have violated work rules of comparable seriousness. Id. at 1167; Lucero v. Sandia Corp., 495 F. App'x 903, 909 (10th Cir. 2012); Macon v. U.P.S., Inc., 743 F.3d 708, 717 (10th Cir. 2014). Whether employees are similarly situated is a fact-intensive inquiry, and what facts are material depends on the case. Lucero, 495 F. App'x at 909.

Disparate treatment does not create an inference of discrimination if defendant's differential treatment of similarly situated employees is trivial, accidental or explained by a nondiscriminatory motive. Swackhammer, 493 F.3d at 1168 (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1232 (10th Cir. 2000)); EEOC v. Flasher Co., 986 F.2d 1312, 1321 (10th Cir. 1992). "[T]he existence of differential treatment [] defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive; where the evidence of pretext supports only nondiscriminatory motives, such an inference is logically precluded and summary judgment for the employer is appropriate." Swackhammer, 493 F.3d at 1168.

Defendant stated that it terminated Horinek's employment because he intentionally scrapped good material from Quintanar's bench. Plaintiff argues that Quintanar engaged in similar behavior, however, and was not fired. Defendant insists that Quintanar did not engage in similar behavior, because he did not intentionally scrap good material.

Even if Quintanar did not intentionally scrap good material, plaintiff has presented evidence that Quintanar engaged in misconduct of comparable (or greater) seriousness. He hid and locked away a part, which resulted in the next shift being unable to work on it, and Spirit only disciplined him even though he caused a work stoppage—which Horinek did not. Further,

Quintanar wasted good material: the very material which Horinek scrapped was on Quintanar's work bench because Quintanar failed his first attempt to make the part. Viewing the record in the light most favorable to plaintiff, Horinek was attempting to fulfill his duty to maintain a clean shop when he accidentally removed what he thought was "excess material."

Plaintiff has established a genuine issue of material fact whether defendant's stated reason for the decision to terminate his employment was pretextual. Accordingly, the Court overrules defendant's motion for summary judgment on this claim.

## II.    Retaliatory Discharge

Plaintiff asserts that in violation of Kansas public policy, defendant terminated his employment because he reported Quintanar's unlawful behavior to management and law enforcement. Defendant seeks summary judgment, arguing that plaintiff cannot establish a prima facie case of retaliatory discharge or show that its legitimate, non-discriminatory reason for terminating his employment was pretext for illegal retaliation.

Kansas recognizes a whistleblower exception to the doctrine of at will employment. See Palmer v. Brown, 242 Kan. 893, 900, 752 P.2d 685, 689–90 (Kan. 1988). Under the whistleblower exception, an employer may not discharge an employee because the employee has reported to company management or law enforcement serious legal violations by co-workers or the employer. See Koehler v. Hunter Care Ctrs., Inc., 6 F. Supp. 2d 1237, 1241 (D. Kan. 1998) (citation omitted). To establish a prima facie case, plaintiff must show that (1) a reasonable person would have concluded that co-worker or company activities violated rules, regulations or laws pertaining to public health, safety and general welfare; (2) prior to termination, defendant knew that plaintiff reported such violations; and (3) defendant terminated plaintiff in retaliation for making the report. Palmer, 242 Kan. at 900; Goodman v. Wesley Med. Ctr., LLC, 276 Kan. 586,

589, 78 P.3d 817, 821 (Kan. 2003). Plaintiff must also demonstrate that he made the report in good faith, rather than out of a corrupt motive such as malice, spite, jealousy or personal gain, and that he reported the infraction to company management or law enforcement officials. Id. If plaintiff establishes a prima facie case, the Court evaluates the claim under the McDonnell Douglas burden-shifting framework. See Eckman, 2007 WL 1959199, at *6. To defeat defendant's motion for summary judgment, plaintiff must assert specific facts which dispute defendant's motive for terminating his employment. Goodman, 78 P.3d at 821.

A.    Whether Plaintiff Can Establish A Prima Facie Case

On February 12, 2023, plaintiff informed his supervisor about Quintanar's potential threat to his wife. On March 2, 2023, plaintiff emailed several Spirit managers to complain that he was a victim of Quintanar's property damage and threats. On March 3, 2023, plaintiff called the Sheriff to report the property damage and threats.

Defendant argues that these activities do not qualify for whistleblower protection because they do not constitute violations of law that are serious enough to warrant an exception to the Kansas doctrine of employment at will. Kansas law only protects the reporting of "serious" violations, but it has yet to define an exact threshold for seriousness. Palmer v. Brown, 242 Kan. 893, 752 P.2d 685, 690 (1988).

Other jurisdictions interpret similar provisions to only protect employees who report violations of rules, regulations and laws whose significance is so substantial and fundamental that there can be "virtually no question" as to their importance for promoting the public good. See Palmerin v. Johnson Cnty., Kans. Bd. of Cnty. Comm'rs, 524 F. App'x 431, 433–34 (10th Cir. 2013) (internal quotations omitted). In Palmerin, the Tenth Circuit found that the "seriousness" requirement arises from the desire to balance the interests of preserving at will employment against

the interest in encouraging employees to report lawlessness, and granting protection for reports on mere "trivia" would harm the former without benefitting the latter.  Id.  The Tenth Circuit therefore determined that Kansas courts would likely use a similar test for seriousness: if the parties can agree to allow the behavior that created the potential claim of wrongdoing and thereby "nullify" the violation of rules, regulations and laws, then those violations are likely not serious.  Id.

In Palmerin, plaintiff reported that a coworker was using defendant's machine for personal use.  Plaintiff reported the coworker for misusing the equipment and later, in litigation, claimed that he had reported criminal deprivation of property.  The Tenth Circuit noted that even if the coworker's use was more than *de minimis*, defendant could easily nullify the supposed crime by allowing the coworker to use the machine (the manager had actually done so).  The present issue is fundamentally different, as Spirit could not nullify plaintiff's claims of stalking or damage to personal property.

Defendant argues that property damage to Horinek's poster cannot be considered a serious violation, implying that the monetary value is too low to be considered serious.  Palmerin specifically declined to identify a monetary threshold that must be met before Kansas retaliation law comes into play.  Id.  Likewise, Hon. John W. Lungstrum has observed that the Kansas Supreme Court likely would not limit whistleblower protection to reports of theft or destruction of property above a threshold minimum value.  Mark R. Eckhart v. Ascend Learning, LLC, No. 21-CV-2176-JWL, 2021 WL 4355661, at *2 (D. Kan. Sept. 24, 2021).

Kansas courts have long recognized public policy of encouraging citizens to report crimes.  See Palmer, 242 Kan. 893, at 899–900.  Protecting employees who report illegal activity from reprisal by fellow employees serves the general public welfare.  Byle v. Anacomp, Inc., 854 F. Supp. 738, 745–46 (D. Kan. 1994).  Kansas law would likely protect a whistleblower from

-18-

retaliation for reporting property destruction and, here, defendant does not deny that Quintanar destroyed some of plaintiff's property.  Viewing the facts in the light most favorable to plaintiff, his multiple reports of property destruction in February and March of 2023 sufficiently reported serious property crime to defendant.

On March 3, 2023, plaintiff also reported threatening statements by Quintanar. Criminalizing stalking, especially in the workplace, is important for the promotion of the public good and to keep Kansas workplaces safe and free from harassment.  Defendant belittles plaintiff's report to law enforcement, stating that Quintanar simply "knew [Horinek's] wife's name."  A reasonable jury could easily find that Quintanar engaged in threatening or stalking behavior, when he made statements concerning Horinek's wife and address, his "research" into Horinek's personal life and that Horinek should be worried about his wife.  These incidents, with the microwave incident, create a genuine issue of material fact that plaintiff reported a serious case of stalking.

Defendant does not deny that it knew of these reports, so plaintiff has established the first two elements of a prima facie case: (1) a reasonable person would have concluded that co-worker or company activities violated rules, regulations or laws pertaining to public health, safety and general welfare; and (2) prior to termination, defendant knew that plaintiff reported such violations.

To establish the final element of his prima facie case, plaintiff must establish a causal connection between a protected act and termination of his employment.  Although Kansas courts have held that temporal proximity alone can be sufficient to satisfy the element of causation for a prima facie case, the Kansas Supreme Court has not directly addressed how close together plaintiff's whistleblowing and any termination of his employment must be.  Bergersen v. Shelter Mut. Ins. Co., 229 F. App'x 750, 754 (10th Cir. 2007); see Anderson v. Coors Brewing Co., 181

-19-

F.3d 1171, 1179 (10th Cir. 1999) (12 weeks too long to establish causation on timing alone, but six weeks may establish causation).

Here, the record reflects that Spirit terminated plaintiff's employment within three weeks of his first whistleblower report. In fact, Trainer's email of March 3, 2023, reports that Spirit management met the same day as plaintiff's report to the Sheriff and immediately decided to suspend its pending investigation and instead move forward with termination. Given its temporal proximity, a reasonable jury could find causation. In explaining why Spirit was suspending its investigation, Trainer started the list with "First off, Greg called the Sedgewick County Sheriff's office to report the threat to his family." Trainer Email (Doc. #58-33). A reasonable jury could view this message as evidence that Spirit cut the investigation short and shifted to termination because plaintiff made his report to the Sheriff. For purposes of plaintiff's prima facie case, this evidence establishes a genuine issue of material fact as to causation.

        B.      Whether Plaintiff Can Establish That He Made The Report In Good Faith

Plaintiff must demonstrate that he made the report in good faith, rather than out of a corrupt motive such as malice, spite, jealousy or personal gain. Defendant asserts that plaintiff's timing shows a corrupt motive, since plaintiff did not call the Sheriff until March 3, 2023, after he learned Spirit was investigating him for taking material from Quintanar's work bench. Plaintiff has presented evidence, however, that Horinek made the report when he realized that Spirit would not take action to address his concerns with Quintanar. On this record, a reasonable jury could find that plaintiff's timing was due to escalation of the ongoing feud between him and Quintanar. Viewing the evidence in the light most favorable to plaintiff, a jury could reasonably conclude that he made the reports in good faith.

        C.      Whether Plaintiff Can Establish Pretext

Because plaintiff has established a prima facie case, under <u>McDonnell Douglas</u>, the burden shifts to defendant to proffer a legitimate and non-retaliatory reason for terminating plaintiff's employment.  As discussed above, defendant asserts several reasons for terminating plaintiff's employment. Shifting the burden, plaintiff must present evidence that defendant's reasons are pretext for unlawful retaliation.  Because the above analysis of defendant's offered reasons applies equally here, the Court need not recount plaintiff's evidence of pretext.

The record reflects a genuine issue of material fact whether defendant's stated reasons for terminating plaintiff's employment were pretextual.  Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's retaliatory discharge claim.

**IT IS THEREFORE ORDERED** that <u>Defendant Spirit AeroSystems's Motion For Summary Judgment</u> (Doc. #58) filed July 16, 2025 is **OVERRULED.**

**IT IS FURTHER ORDERED** that <u>Plaintiff J. Greg Horinek's Motion for Leave to File Surreply Regarding Defendant's Motion for Summary Judgment</u> (Doc. #71) filed August 24, 2025 is **OVERRULED AS MOOT.**

Dated this 15th day of September, 2025 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge